**BLUE EARTH STATE BANK,**
Respondent,

v.

**CROWN LIFE INSURANCE
COMPANY, Appellant,**

J. T. Miller Company, Inc., Respondent,

Blue Earth State Agency, Inc.,
Respondent.

No. 47807.

Supreme Court of Minnesota.

June 9, 1978.

Callaghan & Wendland, Blue Earth, for appellant.

Frundt, Frundt & Johnson, Blue Earth, for plaintiff-respondent.

Berndt, Overson, Nelson & Smith, Mankato, for respondent Miller.

Farrish, Johnson, Maschka & Hottinger, Mankato, for respondent Blue Earth State Agency.

Heard before ROGOSHESKE, TODD, and YETKA, JJ., and considered and decided by the court en banc.

TODD, Justice.

Blue Earth State Bank issued a credit life insurance certificate to Sherman Mensing, now deceased. Mensing was a farmer who maintained an open line of credit with the bank, the outstanding balance of which was in excess of the maximum limits of the credit life policy. Insurance premiums

were paid on Mensing's continuing indebtedness, but no separate renewal applications were submitted after the issuance of the original certificate. After Mensing's death, the insurer refused to pay the claim of the policy's beneficiary. The trial court determined that there was coverage under the policy. We affirm.

In October 1975, respondent Blue Earth State Bank (bank) began this litigation in an effort to collect the proceeds of a credit life insurance policy in which the bank was named beneficiary. A threshold question was whether the indebtedness for which the bank seeks to collect was covered under the terms of the policy. The parties agreed to sever this issue for a preliminary determination. The question was submitted to the district court on stipulated facts and exhibits which we summarize below.

On April 28, 1971, the Crown Life Insurance Company (Crown) issued a group credit life insurance policy (the "master policy") to the Upper Northwest Bankers Association (association). The association is comprised of institutional lenders which offer the Crown credit life insurance coverage to their borrowers. Premiums on such coverage are collected monthly from insured borrowers and are forwarded to the J. T. Miller Company (Miller Company). Pursuant to a contractual arrangement, the Miller Company administers the master policy for the association, receiving a commission for its services. Net monthly premiums are ultimately remitted by the Miller Company to Crown.

On September 13, 1971, the bank became a member of the association and began offering credit life insurance under the Crown master policy. One of the bank's customers was Sherman Mensing, age 44, a farmer who maintained a line of credit with the bank. As of December 30, 1971, Mensing's outstanding indebtedness to the bank totaled $26,059.55. On that date, however, Mensing borrowed an additional $2,200, increasing his indebtedness to $28,259.55. Mensing also elected to purchase $20,000 of credit life insurance, the maximum available to him without special proof of insurability. He signed an authorization which allowed the bank to deduct a monthly premium from his checking account and was in turn issued a certificate of insurance protection.

Thereafter, Mensing's indebtedness to the bank fluctuated, reaching a total of $85,043.44 at the time of his death on January 11, 1975. As of that date, Mensing's various credit transactions had been consolidated by the bank into four notes. Between Mensing's original election of the credit insurance coverage in 1971 and the time of his death in 1975, the bank had continuously deducted the authorized monthly premium of $20 from Mensing's account. Following Mensing's death, the bank sought to collect the full $20,000 of coverage on the policy, since the face amount of the four notes held by the bank far exceeded that sum. Crown declined to pay the bank's claim on the ground that the Mensing indebtedness was not eligible for coverage under the terms of the master policy.

The sole issue on appeal is whether any of the Mensing indebtedness is entitled to coverage under the Crown master policy.

The four notes which comprise Mensing's obligation to the bank was presented to the district court as Exhibits E, F, G, and H. None of these notes existed when Mensing elected to purchase credit insurance in December 1971. In addition, it is undisputed that when new notes were substituted for old notes on his line of credit, Mensing never again specifically reelected the credit life coverage.

Turning to the individual notes, Exhibit E is a demand note in the principal sum of $28,000, and Exhibit H is a note for $23,098.66, with installment payments extending over a period longer than 60 months. The district court held that the Crown master policy unambiguously excluded demand notes and installment loans with a repayment period of more than 60 months from coverage. Exhibit F, however, is an installment note for $8,139.25, with a repayment period of 32 months. Exhibit G is a similar note in the amount of $25,805.53, with a repayment period of 60 months. The dis-

trict court ruled that Exhibits F and G were entitled to coverage, but that the coverage with respect to Exhibit G would be subject to a subsequent adjudication concerning the effect of Mensing's written declination of credit life insurance on the note.[1] We agree with the result reached by the trial court and affirm its judgment.

1. Endorsement 1 of the Crown policy sets forth the general eligibility requirements for coverage under the policy. Crown draws our attention to clause (4) of the endorsement which provides:

> "A borrower who does not elect to be insured hereunder on the date he enters into a contract of indebtedness, shall not be eligible for insurance hereunder."

Crown argues that each of the four Mensing notes constituted a separate "contract of indebtedness," and since Mensing did not specifically elect insurance coverage on each note, all of the notes are excluded from coverage.

█ The problem with Crown's position, however, is that it fails to recognize the nature of the credit arrangement between Mensing and the bank. The bank's ledger sheets (included in the record as Exhibit D) indicate that the periodic consolidation of Mensing's obligations and the issuance of new promissory notes was carried out as part of an ongoing credit transaction. The effect of Crown's argument is to preclude insurance coverage on open line indebtedness unless the formality of application and premium authorization is reenacted with each new note. There is nothing in the master policy, however, which either includes or excludes an open-line-of-credit arrangement from the definition of "contract of indebtedness." That term is defined in endorsement 14 to require a writing, but no other restrictions are imposed.

In addition, we note that the master policy's definition of "insured indebtedness" seems to contemplate precisely the kind of credit arrangement present in this case:

> "As used in this policy, the expression 'insured indebtedness' shall mean the *net amount* owing to the association member from time to time under a *contract of indebtedness* * * * as the result of loans made* by the association member of the type described in endorsement 1 * * *." (Italics supplied.)

The definition refers to the "net amount" due from the borrower as a result of "loans" made by the member bank—a phrase fully consistent with an open line of credit. We conclude that the master policy is at best ambiguous on the treatment of open-line-of-credit transactions. Under the familiar rule of law, we hold that the uncertain language of Crown's master policy must be construed against the insurer and in accordance with the reasonable expectations of the insured. *Caledonia Community Hospital v. St. Paul Fire and Marine Ins. Co.*, 307 Minn. 352, 239 N.W.2d 768 (1976); 9B Dunnell, Dig. (3 ed.) § 4659(16). Accordingly, we adopt the construction as stated above which brings an open line of credit within the master policy's definition of "contract of indebtedness."

█ 2. Crown also argues that portions of Minn.St. c. 62B preclude the interpretation which we have reached. We find this contention to be without merit. Minn.St. 62B.02, subds. 2 and 6, contain the following definitions:

> "Subd. 2. 'Credit life insurance' means insurance on the life of a debtor pursuant to or in connection with a *specific loan or other credit transaction.*
>
> * * * * * *
>
> "Subd. 6. 'Indebtedness' means the total amount payable by a debtor to a creditor in connection with *a loan or other credit transaction.*" (Italics supplied.)

The phrase "other credit transaction" is easily broad enough to encompass the open-line-of-credit arrangement between Mensing and the bank. Additional support for this construction is found in Minn.St. 62B.04, subd. 1(2), which states:

---

1. Mensing specifically declined insurance coverage when he executed the note appearing as Exhibit G. Since the effect of Mensing's elec- tion has been reserved for future determination in this litigation, we ignore this factor in reaching our decision on the merits of this appeal.

"Notwithstanding the provisions of subdivision 1, paragraph (1) of this or any other section, *insurance on educational, agricultural and horticultural credit transaction commitments may be written for the amount of the portion of such commitment that has not been advanced by the creditor.*" (Italics supplied.)

Thus, we find no statutory impediment to holding the Mensing indebtedness partly covered by the terms of the Crown master policy.

Having determined that the district court was correct in finding Exhibits F and G eligible for coverage, we need not address the estoppel question raised in the parties' briefs. There remains for trial, however, the effect of Mensing's written declination of coverage with respect to Exhibit G.

Affirmed.